UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ARMONDO SHELBY,

    Petitioner,

  v.

KENNETH QUINN,

    Respondent.

Case No. C07-5466BHS/JKA

REPORT AND RECOMMENDATION

**NOTED FOR:
JUNE 26, 2008**

    This habeas corpus action, filed pursuant to 28 U. S.C. 2254, has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636 (b)(1)(B) and Local Magistrates' Rules MJR 3 and MJR 4. Petitioner is represented by counsel, Suzanne Elliot (Dkt. # 1). Having reviewed the file, including Judge Worswick's finding of facts from a reference hearing held in Superior Court, the court concludes that petitioner has been denied his Sixth Amendment Right to counsel where counsel had a conflict of interest that adversely affected representation. **This case should be remanded to superior court for a new trial or petitioner**

REPORT AND RECOMMENDATION- 1

**should be released from incarceration**.

BASIS FOR CUSTODY AND FACTS

Petitioner is incarcerated for one count of murder in the first degree, one count of first degree burglary, and unlawful possession of a firearm. He was convicted in Pierce County Superior Court and sentenced to 510 months of confinement. The Washington State Court of Appeals summarized the facts as follows:

I. The Shooting

> In February 1998, Armondo Shelby asked acquaintance Kevin Cubean for a ride to a nearby apartment complex. On the way, Shelby revealed that he was going to the complex to speak with his former girlfriend, Jennifer Bohlen. Shortly after the two men arrived, they observed Bohlen walking up some stairs.
>
> Shelby and Cubean followed Bohlen and contacted her and Thomas Tirrell Butler on a landing outside an apartment. Shelby and Butler began to argue over Bohlen, who was living with Butler at the time. Butler and Bohlen retreated into the apartment and locked the door.
>
> Shelby knocked on the window and door, asked Bohlen to come out, kicked the door in, and entered the apartment. Butler attempted to shut the door to the bedroom, where he and Bohlen were located. Shelby forced his way into the bedroom, and Butler fled to the bathroom. Jeremy Cleveland, Butler's roommate, saw Shelby and Butler struggle in the doorway, saw Shelby shoot Butler (five times), and heard Shelby say, after the first shot, "You like that, huh? You want some more?" Report of Proceedings (RP) (May 12, 1999) at 431-33. Cubean, who had been standing outside, and Shelby fled separately.
>
> Butler died from his injuries soon after police arrived. Shelby surrendered to the police. The police advised Shelby of his Miranda [footnote 1 omitted] rights, which he waived. Shelby admitted that he had brought a silver .357 revolver to Butler's residence and that it was the only gun involved in the altercation. But he claimed that the shooting was an act of self-defense. The police arrested Shelby for murdering Butler.

II. Procedure

> The State charged Shelby with aggravated premeditated murder committed during the course of a burglary or, in the alternative, first degree felony murder; the State included a deadly weapon enhancement with both alternative charges. The State also charged Shelby with first degree burglary and first degree unlawful possession of a firearm. *State v. Shelby*, No. 24986-3-II, No. 25261-9-II, 2001 Wash. App. LEXIS 278 *3, 2001 WL 337867 (Wash. Ct. App. Feb. 9, 2001).

A. Trial Preparation

> Two attorneys with the Department of Assigned Counsel for Pierce County ("DAC"), Jane Pierson and Ray Thoenig, were assigned to represent Shelby.

REPORT AND RECOMMENDATION- 2

Thoenig acted as lead counsel, and Pierson acted as co-counsel.

DAC investigator Mike Stortini [footnote 2 omitted] worked with Pierson and Thoenig on Shelby's case. [footnote 3 omitted] Thoenig, Pierson, and Stortini collectively formulated a strategy for independently investigating Shelby's case.

Although counsel did not personally interview most potential witnesses, Thoenig prioritized Stortini's witness interviews based on police discovery, and Pierson participated in Stortini's interview of Bohlen. Thoenig and Pierson reviewed Stortini's witness interview notes to prepare for Shelby's trial. In addition, the attorneys were in constant communication with Shelby.

### 1. Singleton

At Shelby's request, Stortini interviewed Danion Singleton. Although Singleton had known Shelby since 1990, Singleton had not seen Shelby for approximately a year until they were incarcerated together in the Pierce County Jail. [court's footnote 4. Singleton was incarcerated on unrelated domestic violence charges.] Singleton told Stortini that he had spoken with Shelby about the case and believed Butler was the same person with whom he had a "run-in"-a short, black male named "Tirrell," also known as "T-Dog." Singleton had apparently seen Tirrell on five or six occasions and, on one of those occasions, Tirrell, who was with known gang members, had brandished a firearm at a group of people that included Singleton. Singleton stated that he would be able to identify Tirrell in a photograph.

Following Stortini's interview of Singleton, Pierson and Thoenig listed Singleton as a potential witness for Shelby's trial. Pierson represented Singleton at the same time that she represented Shelby. Pierson did not inform the court that she represented both Singleton and Shelby. Thoenig was unaware that Pierson represented both men.

### 2. Howard

Also at Shelby's request, Stortini interviewed Tony Howard. Howard, who had known Shelby for about two years, was incarcerated with Shelby at the time of Stortini's interview. [court's footnote 5. Howard was incarcerated at the Pierce County Jail, serving a 31-month sentence for reckless endangerment.] Howard told Stortini that (1) his girlfriend, Danielle Griffith, was friends with Bohlen; (2) several days after the shooting, he overheard Bohlen tell Griffith that Shelby shot Butler in self-defense after both men struggled to gain control of the gun; [court's footnote 6. Both Bohlen and Griffith denied making the statement Howard reported that he had heard.] and (3) he (Howard) had seen Butler on several occasions, Butler seemed "pretty cool," and Howard had never observed Butler carrying a gun.

DAC attorney John Chin represented Howard on two separate occasions, the most recent of which was a drive-by shooting charge. In March 1999, Howard pleaded guilty to this charge, for which ongoing hearings continued through June 1999. Chin did not reveal to Pierson or Thoenig any confidential information he had received from Howard. Thoenig was unaware that Chin represented Howard.

### 3. Cleveland

Stortini interviewed Cleveland, who had been "staying" with Butler at the

REPORT AND RECOMMENDATION- 3

time of the shooting. Cleveland told Stortini he would not be surprised if Butler had a gun in the house because Butler had a "gangster type attitude" and saw himself as a "tough guy." Butler apparently had told Cleveland that people warned him (Butler) not to see Bohlen, but it did not matter to Butler because he would "take care of business if he had to." Exhibit (Ex.) at 13.

Other DAC lawyers represented Cleveland at the same time Pierson and Thoenig were representing Shelby. In February 1998, following a conflicts check, Pierson sent a memorandum to Thoenig noting that Pierce County had previously charged Cleveland, but those charges had been dropped. [court's footnote 7. In September 1998, Cleveland was charged with assault in Pierce County and was represented by DAC attorney Paul O'Brien until December 1998, when O'Brien was replaced. Cleveland pleaded guilty in January 1999 and remained on probationary status for two years.]

### 4. Bohlen

Stortini also interviewed Bohlen. Bohlen reported that (1) she had dated Shelby "off and on" for over two years; (2) Shelby had assaulted her many times; (3) she had continued to see Shelby up until the time of the shooting; (4) Shelby knew she was dating Butler; (5) after the confrontation between Shelby and Butler on the night of the shooting, Shelby kicked in the door to Butler's apartment, Butler attempted to shut the bedroom door where he and Bohlen had fled, Shelby forced his way into the bedroom, Butler fled to the bathroom, Shelby followed him, and Shelby then shot Butler several times; and (6) Butler and his cousin shared a gun for protection, but the cousin had taken the gun to Mississippi before the shooting.

Pierson's conflicts check revealed a DAC conflict for Bohlen, a potential witness. DAC had represented Bohlen for two days in 1997. Bohlen also had two outstanding bench warrants from Tacoma Municipal Court. Pierson sent a memo instructing DAC attorneys not to represent Bohlen.

### 5. Other witnesses

Stortini also interviewed Cubean, Robin Griffith, Danielle Griffith, and Shavone Miller.

### B. Pierson's Motion To Withdraw As Defense Counsel

In April 1999, Thoenig informed the trial court about a complete communications breakdown between Pierson and Shelby. The trial court granted Thoenig's motion to allow Pierson to withdraw as co-counsel for Shelby. After Pierson withdrew, Thoenig worked as sole counsel on Shelby's case.

Thoenig also represented multiple other clients during the time he represented Shelby. Before Shelby's trial, Thoenig acted as lead counsel in a four-month aggravated murder trial, which ended on April 14, 1999. Thoenig told the trial court that he was not actively involved in Shelby's case during that time.

### C. Trial

### 1. Jury selection

REPORT AND RECOMMENDATION- 4

Jury panel member Jean Brateng stated on her questionnaire that her brother was a jail guard at the "Tacoma" jail. In response to Thoenig's brief questioning, Brateng explained that she did not live with her brother and did not think her brother's being a jail guard would prevent her from rendering a fair and impartial verdict.

Shelby presented no evidence that this juror's relationship with her brother had tainted her ability to render a fair and impartial verdict. [court's footnote 8. At the reference hearing, Shelby conceded that there was no evidence from which the trial court could conclude that the brevity of Thoenig's questioning Brateng during voir dire fell below an objective standard of reasonableness.] Nor did Shelby exercise a peremptory challenge to Brateng, who remained on the jury.

### 2. Testimony

At trial, the State called witnesses Bohlen, Cubean, Cleveland, Danielle Griffith, and numerous police officers involved in Shelby's case. Thoenig cross-examined most of the State's witnesses, but he did not cross-examine Cubean.

On cross examination, Thoenig did not attempt to impeach Cleveland with his prior convictions, or on whether he had heard Shelby say, "Do you want some more?" Nor did Thoenig elicit Cleveland's statement to Stortini about Butler having a "gangster like attitude" or that Butler would "take care of business."

Thoenig did not give an opening statement or call any defense witnesses. Although fully advised of his right to testify in his own defense, [court's footnote 9. The record does not support Shelby's assertions to us that he wanted to testify at trial but that counsel persuaded him not to testify.] Shelby did not take the stand. Thoenig presented closing argument on Shelby's behalf.

### 3. Verdict

The jury convicted Shelby of first degree murder, first degree burglary, and first degree unlawful possession of a firearm. The trial court sentenced him to 510 months confinement.

(Dkt. # 13,Exhibit 2, Opinion, In re Shelby, Court of Appeals Cause No. 29358-7-II, at 2-8).

## PROCEDURAL HISTORY

Petitioner filed a direct appeal and the Washington State Court of Appeals affirmed the conviction and sentence (Dkt # 13, Exhibits 3 and 4). Petitioner then filed a motion for discretionary review and that motion was denied by the Washington State Supreme Court (Dkt # 13, Exhibits 5,6 and 7).

Petitioner filed a Personal Restraint Petition in which he raised eight claims. The Washington State Court of Appeals the claims were:

(1) The trial court impermissibly commented on the evidence;

REPORT AND RECOMMENDATION- 5

(2) The trial court erroneously gave an aggressor instruction;

(3) The trial court denied his right to a speedy trial;

(4) Juror bias tainted his right to a fair trial;

(5) Trial counsel provided ineffective assistance;

(6) prosecutorial misconduct tainted his right to a fair trial;

(7) cumulative error denied him his right to a fair trial;

(8) Trial counsel had irreconcilable conflicts of interest.

(Dkt # 13, Exhibit 2).

The Washington State Court of Appeals remanded the petition to Superior Court to hold a "reference hearing" on claims 4, 5, and 8.

That hearing was held before Judge Worswick in December of 2004. Judge Worswick's finding of facts and conclusions of law are part of the record in this case (Dkt # 13, Exhibit 12).

The following excerpts from the finding of facts are of special import.

14. There is no evidence before this court that witness Danion Singleton had evidence regarding the victims propensity to violence.

15. Although Shelby submitted notes of a defense investigator regarding the investigator's conversation with Mr. Singleton, there was not sufficient evidence in the record that the person Mr. Singleton was referring to was, in fact, the victim.

32. The defense presented evidence of notes taken by a defense investigator or interviews with Danion Singleton and Jeremy Cleveland. Those notes identified a person as "T-dog".

33. There is no evidence from which this court could conclude as to whether or not T-dog was the victim in this matter.

36. Shelby's attorneys Jane Pierson and Ray Thoenig work for the Department of Assigned Counsel.

37. The Department of Assigned Counsel also represented Tony Howard, Jeremy Cleveland, Daniel[sic] Griffith[1], and Jennifer Bohlen.

38. None of these conflicts created any lapse in representation of Shelby.

---

[1] There are two spellings for Daniel Griffiths name in the record. One is Daniel and the other is Danielle.

REPORT AND RECOMMENDATION- 6

| | |
|---|---|
| 39. | Ray Thoenig did not know of any DAC representation of Tony Howard or Danion Singleton. |
| 40. | There was plausible strategic concerns sufficient to overcome an inference that divided loyalty was the reason Mr. Howard was not called. |
| 49. | Jane Pierson represented Mr. Singleton and Armondo Shelby simultaneously on felony charges in the Pierce County Superior Court. |
| 50. | Mr. Singleton had some potential information regarding the violent tendencies of an individual who he knew as "T-dog," who could have been the victim, Tirrell Butler. |
| 51. | Singleton told the defense investigator, Mike Stortini, that he would be able to identify "T-dog" from a booking photo of the person. |
| 52. | There was no follow up done by defense counsel on the issue of the identity of "T-dog." |
| 53. | Ray Thoenig testified that, if he had information that the victim could have been involved in a shooting prior to his death, he would have followed up on it. |
| 54. | There was no evidence that this was done. |
| 55. | Jane Pierson made the decision not to call Danion Singleton. |
| 56. | Pierson testified that Danion Singleton was not a viable witness because he was not credible. |
| 57. | Although the court finds that Pierson was in a good position to assess the credibility of Singleton, Pierson did not interview Singleton on this case. |
| 58. | Pierson's solution was to resolve the conflict by having her investigator interview him, and making the decision to not call Singleton as a witness. |
| 59. | This failure to interview Singleton and failure to identify the potential conflicting interest here were deficient performance. |

(Dkt. # 13, Exhibit 12, pages 3 to 7). Judge Worswick concluded petitioner had been denied his Sixth Amendment right to counsel because there was an actual conflict as a result of Jane Pierson's simultaneous representation of Armondo Shelby and potential witness Danion Singleton. Judge Worswick concluded this resulted in a failure to investigate evidence favorable to Mr. Shelby's claim of self-defense (Dkt # 13, Exhibit 12, page 8).

REPORT AND RECOMMENDATION- 7

The Washington State Court of Appeals did not adopt Judge Worswick's conclusions of law on this point. Instead, the Court held that Mr. Shelby had not met his burden of showing that an actual conflict of interest adversely affected his lawyer's performance (Dkt. # 13, Exhibit 2, page 26). The Washington State Court of Appeals denied the petition on March 13, 2007 (Dkt. 3 13, Exhibit 2). A motion for discretionary review was filed raising three claims:

1. Were Shelby's trial counsel burdened by a conflict that adversely affected their performance at trial?
2. Was Shelby's counsel ineffective for failing to cross-examine witness Kevin Cubean?
3. Did Shelby knowingly and voluntarily waive his right to testify?

(Dkt. # 13, Exhibit 19). The motion was denied and petitioner filed a motion to modify which was also denied (Dkt # 13, Exhibits 20, 21, and 22).

This federal habeas corpus petition followed and petitioner sets forth three grounds for relief:

GROUND ONE: SHELBY WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE [sic] CONFLICT FREE COUNSEL.

GROUND TWO: SHELBY WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN HIS COUNSEL FAILED TO CROSS-EXAMINE KEVIN CUBEAN AND FAILED TO CALL TONY HOWARD AS A DEFENSE WITNESS.

GROUND THREE: SHELBY WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO TESTIFY AT TRIAL.

Respondent concedes that the three claims are exhausted (Dkt. # 12, page 10).

## EVIDENTIARY HEARING

If a habeas applicant has failed to develop the factual basis for a claim in state court, an evidentiary hearing may not be held unless (A) the claim relies on (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable, or there is (2) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder

REPORT AND RECOMMENDATION- 8

would have found the applicant guilty of the underlying offense. 28 U.S.C. §2254(e)(2) (1996). Petitioner received a reference hearing in state court, and the materials from that hearing along with the findings are part of this record on review. Petitioner's claims rely on established rules of constitutional law. Further, petitioner has not set forth any factual basis for his claims that could not have been previously discovered by due diligence. Finally, the facts underlying petitioner's claims are insufficient to establish that no rational fact finder would have found him guilty of the crime. Therefore, petitioner is not entitled to an evidentiary hearing.

## STANDARD

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. Engle v. Isaac, 456 U.S. 107 (1983). Section 2254 is explicit in that a federal court may entertain an application for writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the constitution or law or treaties of the United States." 28 U.S.C. § 2254(a)(1995). The Supreme Court has stated many times that federal habeas corpus relief does not lie for errors of state law. Lewis v. Jeffers, 497 U.S. 764 (1990); Pulley v. Harris, 465 U.S. 37, 41 (1984); Estelle v. McGuire, 502 U.S. 62 (1991).

Further, a habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. §2254(d). A determination of a factual issue by a state court shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

## DISCUSSION

A.  Right to testify at trial.

Petitioner's third ground for relief is that he was denied his right to testify as guaranteed by

REPORT AND RECOMMENDATION- 9

the Fourteenth Amendment to the United States Constitution.  The Washington State Court of Appeals considered this claim and stated:

> Shelby argues that the reference hearing court should have considered his claim that Thoenig failed to prepare him to testify at trial, prevented him from testifying, and failed to call him as a witness on his own behalf.  The State responds that the trial court advised Shelby of his right to testify and Shelby chose not to testify.  We agree with the State.
>
> Shelby correctly notes that our reference order stated that we did not intend to limit the trial court in its examination of Shelby's claims to ineffective trial counsel assistance by listing the arguments in Shelby's pro se brief, amended brief, and counsel's reply brief as guides.  Nevertheless, Shelby incorrectly suggests that the reference hearing court refused to allow him to develop evidence on this issue.
>
> At the reference hearing, Shelby testified and questioned both Pierson and Thoenig regarding his claim that they rendered ineffective assistance to him at trial.  Although Thoenig could not recall specific details, (1) he explained that he discussed with Shelby the ramifications of testifying, (2) he had never told a client he could not testify at trial, and (3) he would have discussed with Shelby the impact of his prior convictions on his trial testimony if Shelby had chosen to testify.  Pierson also recalled having discussed with Shelby the "down sides and up sides" of testifying on his own behalf.
>
> Most significantly, Shelby acknowledged at the reference hearing that both Pierson and Thoenig had discussed testifying with him.  Further, Shelby testified at the reference hearing that, as a result of his "communications" with Thoenig, he (Shelby) did not testify at trial.
>
> Even though the reference hearing court did not articulate a conclusion on this issue, the record shows that (1) the reference hearing court allowed Shelby to present testimony about his claim that he had been denied his right to testify at trial, (2) Pierson and Thoenig advised Shelby about his right to testify at trial, and (3) Shelby made a "knowing and voluntary" decision not to testify at trial.  *State v Thomas*, 128 Wn.2d 553, 558, 910 P.2d 475 (1996).  Thus, the record does not support Shelby's assertion that the reference hearing court prevented him from developing a record on his claim that he was denied his right to testify at trial.

(Dkt. # 13, Exhibit 2, pages 27 and 28).

The Washington Court of Appeals decision on this claim is well reasoned.  There is nothing in this record to show that petitioner's decision not to testify was not knowingly made.  This ground for relief is without merit.

  B.  <u>Ineffective assistance of counsel for failure to cross-examine Kevin Cueban and for failure to call Tony Howard.</u>

In order to establish ineffective assistance of counsel, a petitioner must show that counsel's

REPORT AND RECOMMENDATION- 10

representation fell below an objective standard of reasonableness and that the deficient performance affected the result of the proceeding. Strickland v. Washington, 466 U.S. 668, 686 (1984). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689. In order to demonstrate prejudice, the defendant must show there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different. Strickland, 466 U.S. at 694.

Under the first prong of the Strickland test, the question is whether counsel's assistance was reasonable under the totality of the circumstances, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690. To succeed under the first prong, the petitioner must show the attorney's conduct reflects a failure to exercise the skill, judgment, or diligence of a reasonably competent attorney. United States v. Vincent, 758 F.2d 379, 381 (9th Cir.), cert. denied, 474 U.S. 838 (1985).

Under the second prong, the petitioner must demonstrate prejudice, that but for counsel's unprofessional errors, the result would have been different. Strickland, 566 U.S. at 694. However, sheer outcome determination is not sufficient to make out a Sixth Amendment violation; a proper prejudice inquiry focuses on whether counsel's errors or omissions rendered the proceeding fundamentally unfair or the result unreliable. Lockhart v. Fretwell, 113 S.C. 838, 842-44 (1993). With this standard in mind the court considers petitioner's claims.

    1.    <u>Cross examination of Kevin Cueban</u>.

The Washington State Court of Appeals considered petitioner's claim and held:

> Shelby also argues that he received ineffective assistance of counsel because Thoenig was unprepared to cross-examine Cubean and therefore, failed to do so. Although the reference hearing court found that it was not objectively reasonable for counsel to fail to elicit testimony from Cueban, it also found that the outcome of the proceedings would not have differed even if counsel had elicited this testimony.
>
> Cueban could have testified that he heard scuffling immediately before the shooting and Shelby was calm as the two men drove to Butler's apartment. This testimony might had supported Shelby's claim of self-defense. But even if it was not objectively reasonable for defense counsel to have failed to call Cubean, this testimony would have merely been duplicative of Bohlen and Cleveland's testimony about Shelby's struggle with Butler at the bedroom door. Moreover, Cubean's

REPORT AND RECOMMENDATION- 11

testimony would have been unpersuasive given that he has merely heard the scuffle while standing outside, while Bohlen and Cleveland were both inside the apartment and witnessed the struggle. Therefore, we affirm the reference hearing court's finding that the absence of Cubean's testimony did not deprive Shelby of a fair trial. *Strickland v Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

(Dkt. # 13, Exhibit 2, page 22). The state court has correctly identified the issue and applied the proper standard of review. Further, the holding is not contrary to clearly established federal law, as determined by the Supreme Court. Nor does the holding involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Finally, this holding does not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. Indeed, the court identified what the witnesses may have been able to testify to and compared that testimony with what other witnesses offered. The court found the testimony to be largely duplicative. This court concurs with the analysis and conclusion.

    2.    <u>Failure to Call Tony Howard</u>.

There is nothing in the record to indicate Tony Howard was present at the apartment the night of the shooting. Defense investigator Stortini interviewed this potential witness at Shelby's request. Mr. Howard claims his girlfriend, Danielle Griffith, and Jennifer Bohlen are friends. Mr. Howard alleges that about a week after the shooting he heard Bohlen tell Griffith that Shelby shot Butler in self defense while the two men were struggling for control of the gun. Both Griffith and Bohlen deny that this statement was made (Dkt. # 13, Exhibit 12, page 19).

The Washington State court of Appeals considered this claim and held:

   ...Shelby contends that "[t]he only explanation for counsel's failure to call Howard as a witness is that he was a prior client of DAC." Br. Of Pet. On Review at 12. Shelby argues that (1) his counsel's failure to call Howard as a witness was due to a conflict of interest, (2) this conflict resulted in a lapse in Shelby's representation, and (3) therefore, the reference hearing court incorrectly found that DAC's representation of Howard did not cause a lapse in DAC's representation of him (Shelby). We disagree.

      The record supports the reference hearing court's finding that there were legitimate tactical reasons for not calling Howard to testify at Shelby's trial. First, both Bohlen and Griffith denied having made the statement that Howard claimed to have overheard– Bohlen telling Danielle Griffith that Shelby shot Butler in self-defense. Second, even if Howard had testified at trial, his hearsay reiteration of

REPORT AND RECOMMENDATION- 12

> Bohlen's alleged statement would have been potentially admissible only to impeach Bohlen. It would not have been admissible to prove the truth of the matter asserted, namely that Shelby shot Butler in self-defense. Third, Howard claimed to have known Shelby for two years and they had been housed in adjacent cells for a period of time, which might have been used to show Howard's bias if he had testified. Fourth, at the time of Shelby's trial, Howard was serving a sentence for two counts of reckless endangerment and evidence of his criminal activity might have been an issue for cross-examination had he testified. The reference hearing court found that if Shelby's attorney had offered this testimony from Howard, there was a risk of opening the door to the issue of Danielle Griffith's alleged coercion.
>
> In addition, the record shows not only that Howard's testimony would have failed to bolster Shelby's defense, but also that it could have damaged his case. Howard would have testified that he had seen Butler on several occasions, during which Butler has seemed "pretty cool" to Howard; Howard had never observed Butler carrying a gun. Thus, Howard's testimony would have negated Shelby's trial strategy–to show that, because Butler had a reputation for violence, Shelby had justifiably shot Butler in self defense. The "specific and plausible strategic concerns" weighing against calling Howard as a defense witness support the reference hearing court's finding that defense strategy, not divided loyalty, was the reason Thoenig chose not to call Howard to testify on Shelby's behalf. *See Robinson*, 79 Wn.App at 399-400. We hold, therefore that there was substantial evidence to support the reference hearing court's finding number 40 that there were plausible strategic concerns for defense counsel not to have called Howard to testify on Shelby's behalf.

(Dkt. # 13, Exhibit 2 pages 19 to 21).

Given the limited value of Howard's testimony and the potential problems putting him on the stand may have caused, this court concurs with the Washington State Court of Appeals on this issue. The decision of the State court is not contrary to clearly established federal law, as determined by the Supreme Court. Nor does the holding involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Finally, this holding does not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. This claim is without merit.

      C.      <u>Conflict of interest regarding Danion Singleton</u>.

The court begins it's analysis of this claim by considering <u>Holloway v. Arkansas</u>, 435 U.S. 475 (1978). Joint or multiple representation is not a *per se* violation of the Sixth Amendment. <u>Holloway v. Arkansas</u>, 435 U.S. at 482. Eight years later the Court explained that to establish a Sixth Amendment violation a defendant needed to do more than point to a mere possibility of a conflict in interest. <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980). The Court in <u>Cuyler</u> stated:

REPORT AND RECOMMENDATION- 13

> In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.

Cuyler v Sulivan, 446 U.S. at 348.

There was obviously multiple representation in this case. At the time Jane Pierson was representing Mr. Shelby on his felony charges she also represented Danion Singleton on a felony charge.

When Mr. Shelby asked that Danion Singleton be interviewed as a potential witness Pierson arranged for Mr. Stortini to interview him so he (Singleton) would not be confused as to her role (Dkt. # 13, Exhibit 2, page 24). Thus, at the outset, the fact that Danion Singleton was a client affected the decision who would interview him. Further, the interview disclosed that further, followup investigation would be needed to determine if the person Mr. Singleton knew as Tirrell and "T-Dog" was in fact Thomas Tirrell Butler. This followup investigation did not happen. Later, Pierson would decide not to call Singleton as a witness because she did not believe him credible. Pierson made this decision without having interviewed this potential witness. Thoenig did not know that Singleton was represented by Pierson.

Petitioner has shown that there was an actual conflict and that conflict affected the investigation and decision whether to call Mr. Singleton as a witness. Petitioner is entitled to relief from his conviction and sentence.

Respondent argues the conflict of interest at issue in this case is not "clearly established law as determined by the Supreme Court" (Dkt # 12, page 16). Respondent contends the Supreme Court holdings on conflicts of interest are limited to conflicts based upon counsel's representation of multiple defendants in the same case. Respondent is in error. Holloway dealt with the same case situation. Holloway v. Arkansas, 435 U.S. 475 (1978). In Cuyler, there were separate trials, but the defendants were being tried for the same criminal conduct. Cuyler v. Sullivan, 446 U.S. 335 (1980). The Supreme Court has considered a conflict of interest claim in a situation where the attorney represented the clients on unrelated charges. Dukes v. Warden Connecticut State Prison, 406 U.S.

REPORT AND RECOMMENDATION- 14

250 (1972). The Court applied the test of actual conflict and agreed with the Connecticut Supreme Court that the alleged conflict in that case did not affect representation. The fact that the conflict arose in unrelated cases is not an issue. Thus, Respondent's argument appears to be without merit.

The Superior Court in this case held a reference hearing and determined there was an actual conflict of interest that adversely affected investigation of potential witness Singleton. The Washington Court of Appeals rejected the conclusion of law and held Pierson's statement that she found Singleton not credible was sufficient to overcome the inference that divided loyalty caused Pierson not to call Singleton. The court goes on to note Shelby presented no evidence to show that Danion Singleton had evidence of the victim's propensity to violence. The Washington State Court of appeals holding ignores the fact that followup investigation was not done to determine if Mr. Singleton had admissible evidence. Danion Singleton told Mr. Stortini about a man he knew as Tirrell or "T-Dog", a short black man who may have been the victim in this case. "Singleton had apparently seen Tirrell on five or six occasions and, on one of those occasions, Tirrell, who was with known gang members, had brandished a firearm at a group of people that included Singleton. Singleton stated that he would be able to identify Tirrell in a photograph." (Dkt. # 13, Exhibit 2, page 4). No followup investigation occurred. Pierson did not personally interview this witness, yet she made the determination the witness was not credible.

The holding of the Washington State Court of Appeals resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. Mr. Singleton is entitled to relief. This petition should be **GRANTED** and the case should be remanded for a new trial or, Mr. Shelby should be released.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **June 26. 2008**, as noted in the

REPORT AND RECOMMENDATION- 15

1 | caption.

3 | Dated this 4 day of June, 2008.

5 | /S/ *J. Kelley Arnold*
J. Kelley Arnold
6 | United States Magistrate Judge

28 | REPORT AND RECOMMENDATION- 16